## Case No. 14,458.

### UNITED STATES v. The ANNA.

[1 Taney, 549.] [1]

Circuit Court, D Maryland. Nov. Term, 1854. [2]

SHIPPING—FORFEITURE—ILLEGAL NUMBER OF PASSENGERS—FROM FOREIGN PORT—MEASUREMENT OF VESSEL—STATUTES—APPEAL.

1. The second section of the passenger act of 1819 [3 Stat. 488] is repealed by the tenth section of the act of 17th May, 1848 [9 Stat. 223].

2. The tenth section of the act of 1848, in repealing the first section of the act of 1819, regulating the number of passengers, repealed all other parts of the law which inflicted penalties and forfeitures for breaches of the rule thereby established.

3. The act of 1848 designed to repeal altogether the rule of apportionment of passengers, by tonnage, and to establish that provided by the act of 22d February, 1847, as the only one by which the ship-owner was to be governed.

4. The act of February 22d, 1847, § 1 [9 Stat. 127], provides that, if the master of a vessel shall take on board, at a foreign port or place, a greater number of passengers, in proportion to

1 [Reported by James Mason Campbell, Esq., and here reprinted by permission.]
2 [Affirming Case No. 14,457.]

the space appropriated for their use, than is therein specified, with intent to bring such passengers to the United States, and shall leave such port or place with the same, and bring the same, or any number thereof, within the jurisdiction of the United States, the master shall be deemed guilty of a misdemeanor, and fined fifty dollars, and may be imprisoned for a term not exceeding one year. The proportion prescribed by this section is, one passenger for every fourteen clear, superficial feet on the lower deck or platform; this space to be unoccupied by stores or other goods not being the personal luggage of such passengers; if the vessel is to pass through the tropics, the proportion is required to be twenty superficial feet, instead of fourteen. The second section subjects the vessel to forfeiture, in case the passengers "so taken on board and brought into the United States," shall exceed, by twenty, the number limited in the first section: *Held*, that the words "so taken on board and brought into the United States," refer to the whole provisions of the preceding section: they refer to the entire transaction there described, to the taking on board the forbidden number, as well as to the bringing them, or any number of them, into the United States.

[Cited in U. S. v. Nicholson, 12 Fed. 524.]

5. The taking on board, the intent at the time, and the bringing into the United States, are all constituent parts of the offence; it is consummated by the entry of the vessel into one of our ports, with any portion of the passengers on board, who have been exposed to the maladies and diseases incident to an overcrowded ship on such a voyage. If congress had intended to make the offence depend upon the number brought in, and that the number taken on board should not constitute a part of it, then the words "so taken on board" ought to have been omitted.

6. The vessel is forfeited, if, when she left her European port for the United States, with one hundred and eighty-five passengers, the space occupied by them was not in the proportion of fourteen superficial feet to each passenger: and she is equally liable to forfeiture, if that proportion of the space was diminished at any time during the voyage, unless it was necessary, for a time, by the dangers of the sea.

7. The eighth section of the act of May 17th, 1848, does not repeal or modify any of the regulations of the act of 1847.

8. The two acts (1847 and 1848) relate to the same subject-matter, are intended to accomplish the same object, and must be construed together; the eighth section of the act of 1848, when it speaks of the number of passengers to be taken on board and brought into the United States, refers to the numbers provided for in the act of 1847, and makes no new provision on that subject.

9. A measurement of the vessel, and a statement placed on the files of the custom-house, specifying the number of passengers she is entitled to transport, is not conclusive upon the government, as evidence of the capacity of the vessel.

10. It is the duty of the ship-owners to know how many they can legally transport: and if the fact is disputed, it is for the judiciary to decide upon the whole testimony.

11. The question of forfeiture or not must be determined by the actual capacity of the surface appropriated to the use of the passengers.

12. Where the space occupied by certain boxes on the berth-deck of a passenger vessel, was lawfully so occupied, if the boxes contained luggage belonging to the passengers, and was unlawfully so occupied, if they did not, it is incumbent on the United States, in a proceeding for the forfeiture of the vessel, to show what was the contents of such boxes, in order that it may be

known whether the offence operating the forfeiture has been committed.

13. The act of congress regulating the mode of transportation, is intended, not only for the protection or convenience of the passengers, but also to guard our own cities from disease, and from the burden of supporting a multitude of persons brought to our shores with their health broken on the voyage, by overcrowding them in the ship, or feeding them with unwholesome food; and when the law has regulated the manner of transportation, and prescribed the proportion which the number of passengers shall bear to the space appropriated to their use, neither their assent nor request, nor their supposed convenience, will justify the master in violating the provisions of the statute

14. In a proceeding for the forfeiture of a vessel under the passenger acts, a cause of forfeiture, not made a charge against the master and ship-owners, which is not one of the grounds upon which the forfeiture is claimed, and which was not noticed in the district court, is not properly before the circuit court, on appeal.

[Appeal from the district court of the United States for the district of Maryland.]

The libel in this case was filed in the district court, on the 27th of December 1853, against the barque Anna, a foreign vessel, belonging to the port of Bremen. It claimed a forefeiture of the vessel, for a violation of the acts of congress relating to the transportation of passengers to the United States from foreign countries. The forfeiture was claimed on the ground that, on the 20th day of October 1853, Heinrick Raschen, then, and up to the time of the seizure, being master of the said barque, (she being of 275 tons burden) took on board, at the port of Bremen, 235 passengers, who were above the age of one year, 231 of whom were passengers other than cabin passengers, with the intent to bring them to the United States; and did leave said port with said passengers, all of whom, with the exception of twelve who died on the voyage, were brought by the said barque into the port of Baltimore, where she arrived about the 18th of December 1853; which number of passengers, thus brought into the port of Baltimore, was an excess of more than twenty passengers over two passengers for every five tons of said barque, contrary to the provisions of the second section of the act of congress, approved the 2d of March, 1819, entitled "An act regulating passenger ships and vessels." That the space on said barque, appropriated to the said 219 passengers, other than cabin passengers, who were so brought into the port of Baltimore, and occupied by them, and unoccupied by stores and other goods, not being the personal luggage of said passengers, was only 2684 superficial feet of the lower deck or platform on which said passengers were accommodated; which number of passengers was an excess of more than twenty over one passenger for every fourteen clear superficial feet of deck so appropriated and occupied; contrary to the provisions of the second section of the act of congress approved the 22d day of February, 1847, entitled "An act to regulate the carriage of passengers in merchant vessels." That the portion of said barque appropriated, during said voyage, to 174 of the above-described passengers, other than cabin passengers, who were brought into the port of Baltimore, was between decks, and the space appropriated to them and occupied by them, and unoccupied by stores or other goods, not being the personal luggage of said passengers, was only 2054 superficial feet of the lower deck or platform on which said passengers were accommodated, and carried during said voyage; which was an excess of passengers of more than twenty over one passenger for every fourteen clear superficial feet of deck so appropriated and occupied; contrary to the provisions of the second section of the said act of congress approved the 22d day of February, 1847. That the portion of the said barque Anna, appropriated to 186 of said passengers, other than cabin passengers, received on board said barque at Bremen as aforesaid, with intent to bring the same to Baltimore as aforesaid, was between decks, and the space appropriated to them and occupied by them, and unoccupied by stores or other goods, not being the personal luggage of said passengers, was only 2054 superficial feet of the lower deck or platform on which said passengers were accommodated and carried; that twelve of said passengers died after leaving Bremen, and before her arrival in the United States; that said passengers so received at Bremen, with intent to be brought to Baltimore, were an excess of more than twenty, to wit, an excess of forty passengers over one passenger for every fourteen clear superficial feet of deck so appropriated to and occupied by said one hundred and eighty-six passengers so received at Bremen as aforesaid; contrary to the provisions of the second section of said act of congress, approved the 22d of February, 1847. The answer of Hermann von Kapff, claimant of said barque, in behalf of her owners, after stating the ownership of the barque and the illegality of her seizure, alleged that said barque belonged to the port of Bremen in Germany and was of the capacity of 383 tons. That on the 3d day of November 1853, Henry Raschen, being then and ever since, the master of said barque, she sailed from Bremer Haven, the port of Bremen, bound for Baltimore, with 234 passengers on board, of whom four were cabin passengers, forty-nine were second cabin or steerage passengers on deck, and one hundred and eighty-five were between-deck passengers; that the whole number of passengers was, as above stated, 234 and not 235, as alleged in the libel; that 230 were passengers other than cabin passengers, and not 231, as stated in the libel; and that eleven died on the passage and not twelve as stated in the libel. That all of said passengers, except those who died as above stated, were brought by said barque into the port of Bal-

timore, where she arrived about the 20th of December 1853. He admitted that said number was more than an excess of twenty passengers over two passengers for every five tons burden of said barque, but he denied that such excess was any ground of forfeiture, or in any wise contrary to law; on the contrary, he alleged and believed it to be true, that said barque was by law authorized to take and carry between-decks alone 192 passengers, as would appear by a draft of the between-decks of said barque and measurement thereof, prepared and certified to by Robert C. Barnes, measurer of the United States for the port of Baltimore, and furnished by said Barnes to Captain Raschen, and filed with the answer, and which measurement he had a right to suppose to be correct. He denied that there were 219 passengers brought in said barque into the port of Baltimore, on the lower deck or platform called the between-decks of said barque, and alleged that the number actually brought into said port of Baltimore on said lower deck was 174; but he did not believe it to be true, and therefore denied, that the space appropriated to them and occupied by them and unoccupied by stores or other goods, not being the personal luggage of said passengers, was only 2054 superficial feet of the lower deck or platform on which said passengers were accommodated and carried, during said voyage, as is charged in said libel. A voluminous mass of testimony was taken in the case, the substance of which is fully stated in the opinion of the court. The libel was dismissed by the district court [Case No. 14,-457], and appeal taken to this court.

Wm. Meade Addison, for appellants.
Brown & Brune, for appellee.

TANEY, Circuit Justice. I shall affirm the decree of the district court in this case. But as it is the first that has come before this court under the acts of congress regulating the transporting of passengers, and involves several questions which have been strongly contested in the argument, it is proper that I should state fully the grounds upon which my opinion is founded.

The barque Anna sailed from Bremer Haven. in November 1853, and arrived in the port of Baltimore in the December following; she took on board at Bremer Haven, on the lower deck or platform, one hundred and eighty passengers, with intent to bring them to the United States, and left the port with that number on board; the cholera made its appearance among them on the day she sailed, and eleven passengers died on the voyage; she brought into the United States one hundred and seventy-four. Upon her arrival at the port of Baltimore. she was seized as forfeited to the United States. for a violation of the passenger laws; and it is contended on the part of the United States that she is liable to forfeiture under the acts of congress of 1819 and 1847, on account of the number of her passengers beyond those authorized by those laws.

The testimony in the case is exceedingly voluminous, and before I examine it, it is necessary to dispose of some questions of law which have been raised on the construction of these acts of congress. In relation to the act of 1819, I think it quite clear, that the libel cannot be maintained under the law. The first section prohibited any vessel from taking on board or bringing to the United States, more than two passengers for every five tons of such vessel, and inflicted certain penalties on the master and owners who should be guilty of violating this provision; and by the second section, if the number of passengers should exceed the proportion of two to every five tons, by twenty, the vessel was forfeited. But this regulation is repealed by the tenth section of the act of May 17th, 1848. It is true, the repealing clause speaks only of the first section; but it is that section which regulates the number of passengers by the tonnage of the vessel; and in repealing that regulation altogether, they certainly repealed all other parts of the law which inflicted penalties and forfeitures for breaches of the rule thereby established. It cannot be supposed that congress intended, by the repealing clause, to exempt the master and owners from the pecuniary penalty inflicted on them by the first section, for a breach of this law, and retain the heavier penalty of forfeiting the ship; such a construction would be unreasonable. It is evident that the act of 1848 designed to repeal altogether the rule of apportionment, by tonnage, and to establish the one provided by the act of February 22d, 1847, as the only one by which the ship-owner was to be governed.

The act of 1847 is supposed to present a question of more difficulty; but, after a careful examination, I think it will be found free from doubt. The first section provides that, if the master of a vessel shall take on board, at a foreign port or place, a greater number of passengers, in proportion to the space appropriated for their use, than is therein specified, with intent to bring such passengers to the United States, and shall leave such port or place with the same, and bring the same, or any number thereof, within the jurisdiction of the United States, the master shall be deemed guilty of a misdemeanor, and fined fifty dollars, and may be imprisoned for a term not exceeding one year. The proportion prescribed by this section, is one passenger only for every fourteen clear superficial feet, on the lower deck or platform, this space to be unoccupied by stores or other goods, not being the personal luggage of such passengers. If the vessel is to pass through the tropics. the proportion is required to be twenty superficial feet instead of fourteen. The second section subjects the vessel to forfeiture, in case the passengers "so taken on board and brought into the United

States," shall exceed, by twenty, the number limited in the first section.

The claimants contend that the barque cannot be condemned, although there may have been an excess of twenty passengers in proportion to the space, when she sailed, unless there was a like excess when she entered the United States, that is, that although the 185 which she took on board at Bremer Haven, may have exceeded, by twenty, the proportion to the space prescribed by the act of congress, yet she is not forfeited, unless the 174 which she brought into the United States, also exceeded, by twenty, the number which could lawfully be accommodated in the space appropriated to the use of the passengers.

But this construction cannot be maintained, either upon the grammatical or fair construction of the act of congress, or upon its evident object and policy. The words "so taken on board and brought into the United States," refer to the whole provisions of the preceding section, they refer to the entire transaction therein described, to the taking on board the forbidden number, as well as to the bringing them, or any number of them, into the United States. The taking on board, the intent at the time, and the bringing into the United States, are all constituent parts of the offence; and it is consummated, by the entry of the vessel into one of our ports, with any portion of the passengers on board, who have been exposed to the maladies and diseases incident to an overcrowded ship on such a voyage. If congress had intended to make the offence depend upon the number brought in, and that the number taken on board should not constitute a part of it, then the words "so taken on board," ought to have been omitted.

There is certainly nothing in the object and policy of the law to induce the court to restrain the operation of this clause of the statute, within narrower limits than its language naturally and justly imports. Before congress legislated upon the subject, the transportation of passengers to this country, was, in many instances, conducted in a manner that shocked the moral sense of the community; the ships were crowded to excess; the places allotted to the passengers not ventilated; and they were often, during the voyage, fed upon unwholesome food, or restricted to a very scanty allowance. The natural result was, that ships were continually arriving with contagious and infectious diseases on board; and after having lost, on the voyage. a great portion of the passengers, brought the survivors into the country, so emaciated with disease, as to become a public burden, and often introducing contagious and infectious maladies contracted on shipboard, endangering thereby the health and the lives of our own citizens

It was to prevent these evils, that congress passed the act of which we are speaking, as well as the other statutes upon the same sub-

ject. It is the duty of the court to interpret them, and execute them in the spirit in which they were enacted by the legislature; to give to the words of the law a fair and just interpretation with reference to the object intended to be accomplished; and to inflict the penalty prescribed by the act, whenever its provisions have been disregarded. The construction contended for by the claimant, would make the act perfectly nugatory; for, if the ship-owner crammed his vessel, like an African slave-trader, and fed his passengers upon food injurious to health, he would be perfectly sure, that all of those taken on board would not live to be brought within the jurisdiction of the United States; and that they would be sufficiently thinned before the voyage was over, to have, upon their arrival, the proportion of fourteen superficial feet for the number who survived. It is impossible to suppose that congress contemplated such an object, nor have they, in my judgment, used words which lead to such a conclusion; but have required that the space allotted to the passengers should be in the proportion specified in the law, when the vessel leaves the foreign port, and should be preserved throughout the voyage, in proportion to the numbers thus taken on board.

This vessel, therefore, is forfeited, if, when she took her departure from Bremer Haven, with one hundred and eighty-five passengers, the space occupied by them was not in the proportion of fourteen superficial feet to each passenger; and she is equally liable to forfeiture, if that proportion of the space was diminished, at any time during the voyage, unless it was made necessary, for a time, by the dangers of the sea.

Nor does the eighth section of the act of May 17th, 1848, repeal or modify this provision of the act of 1847. The section referred to in that act, relates entirely to the size and height of the berths; and if the construction given to it by the claimant was the true one, and it was necessary to show that the whole number of passengers taken on board, were brought in, before the vessel could be condemned under the section referred to, yet the provision extends only to the regulation of the berths, and is confined to forfeitures on that account. It does not repeal any of the regulations in the act of 1847; nor is it, in any respect, inconsistent with them. If the construction of the claimant was admitted to be the true one, the regulations of both acts would still stand, and be in force; the forfeiture under the act of 1848 being confined to the defect of the berths, and not affecting in any degree the provisions of 1847, which forfeits for the want of space for the passengers and their luggage. The act of 1848 was passed to provide additional security for the health of the passengers, and not to impair or lessen the security provided by the previous law.

But the construction given to the last-men-

tioned law by the claimant, cannot be maintained, even where the forfeiture is demanded on account of a defect in the berths. The two acts relate to the same subject-matter, are intended to accomplish the same object, and must be construed together; the eighth section of the last act, when it speaks of the numbers to be taken on board and brought into the United States, refers to the numbers provided for in the act of 1847, and makes no new provision on that subject.

These being the regulations of law upon this subject, I proceed to examine the testimony, as far as it is material to the decision of the case. There is a good deal of controversy, as to the number of superficial feet on the deck occupied by the passengers; but it is unnecessary to incumber this opinion with the multitude of figures and calculations brought forward in the testimony. It is sufficient to say, that the evidence proves to the satisfaction of the court, that the deck was large enough to accommodate one hundred and eighty-five passengers, and no more, according to the space prescribed by the act of congress. In ascertaining the superficial contents of a ship's deck, some difference will occasionally take place, where it is measured, at different times, by different persons; the width of the ship from stem to stern not being the same, the average width by which the contents are to be calculated, when ascertained by different lines in different sections of the vessel, will necessarily vary in some degree from each other. But the difference between the witnesses in this case is greater than ought to exist, if all of the measurements had been made with ordinary care and skill, and the wide difference between them shows that some must have been loosely or unskillfully made. Upon weighing the whole testimony, I think she was capable of accommodating the number of passengers above mentioned, and no more.

It appears, that some years ago a measurement was made of this vessel. and a statement placed on the files of the custom-house in Baltimore, by which she was entitled to transport one hundred and ninety-two passengers on this deck; a copy of this statement was given to the master of the barque, and on several voyages preceding the one in question, he has brought to this port the number of passengers specified in that statement. without objection. And the respondent now contends, that this certificate, thus placed in the hands of the master, and acted upon by him in former voyages, is conclusive upon the government; and that in determining whether the number taken on board in this instance exceeded, by twenty, the legal number, the capacity of the vessel ought to be rated at one hundred and ninety-two. But this point is altogether untenable. The act of congress does not authorize any particular officer to make the measurement, or to give a certificate to the master; it is the duty of the ship-

owners to know how many they can legally transport; and if the fact is disputed, it is for the judicial power to decide upon the whole testimony.

Indeed, if such a principle should be sanctioned by the court. it might lead to flagrant abuses. This case itself shows its evil tendency; for here is a vessel proved, upon careful measurement, to be able to accommodate legally only one hundred and eighty-five passengers, and yet the master is in possession of a certificate from an officer of the customs, founded upon some measurement made loosely, or under improper influences, which rates the capacity of the vessel at one hundred and ninety-two. And under the protection of this certificate, it appears, has been illegally crowding passengers in former voyages, and carrying on the trade, in direct contravention of the act of congress.

The question of forfeiture or not must be determined by the actual capacity of the surface appropriated to the use of the passengers. As I have already said, the whole deck of the barque Anna afforded space for one hundred and eighty-five; but a bulkhead was put up abaft the mizen mast. very soon after the vessel left Bremer Haven, and the space between this bulkhead and the stern, was filled with cargo or stores, and the passengers excluded from it. There is some controversy about the exact extent of the space thus cut off; but from the whole evidence, I think it is shown, that it contained superficial feet enough for the accommodation of fifteen passengers, according to the proportion prescribed by law. This left room for only one hundred and seventy, while one hundred and eighty-five were on board; here, then, is clearly an excess of fifteen above the legal number. But this excess does not forfeit the vessel; it must amount to five more, that is, to twenty, before a forfeiture can be claimed.

In order to show that the space was still further curtailed. it is insisted on the part of the United States. that another bulkhead was made, from one to three feet forward of the foremast. by placing hogsheads on their ends, across the ship, from side to side. so as to prevent the passengers from passing beyond it, and that the space between this bulkhead and the apron of the ship, was filled with boxes and chests, and that those boxes and chests, for the most part, if not altogether, contained cargo, and was not appropriated to the use of the passengers or their personal luggage; and if this allegation can be maintained, the vessel is undoubtedly forfeited, for this bulkhead would cut off far more than space for five passengers, and make the illegal excess placed between these bulkheads much greater than twenty.

But this allegation is denied by the respondents, and they insist, that the hogsheads spoken of were only two bread-casks, which had (after being emptied) been brought up from the hold and filled with potatoes;

that the potatoes were a part of the provisions for the voyage, and were originally placed in the hold of the vessel; but that from storms experienced during the voyage, the hold had become damp, and the potatoes were spoiling, and that they had been brought up to be picked and dried, and suffered afterwards to remain there because they were more accessible to the passengers; and that there was room on each side of them to pass forward. That the boxes and chests placed there contained the personal luggage of the passengers, with the exception of two or three boxes which contained beds or bedding, or some trifling articles of household furniture, upon which he had charged no freight; that, like the potatoes, they had become wet from the effect of severe storms, and were, at the request of the owners, brought up to dry, and suffered afterwards to remain. This is the main point in the dispute, and it has appeared to the court from the first statement of the case, that it must turn upon the decision of this part of the controversy; and many witnesses have been examined upon it by the parties, to support their respective allegations.

It is proper to observe, that there were no berths forward of the foremast; they were all between the after-bulkhead and the foremast, and there were on each side of the deck, a line of chests and boxes, in front of the berths, containing personal luggage of the passengers. But it does not, by any means, follow that these rows of chests and boxes along the berths contained all the personal luggage which passengers brought with them, and which might lawfully be placed within the space allotted to their use. Every passenger whose means would afford it, undoubtedly, brought with him apparel of a different quality, from that which he used in a rough exposure of a sea-voyage in a crowded ship; and this apparel was a part of his personal luggage which, to a reasonable amount, might legally be placed in the space appropriated to the passengers. And as the boxes and chests containing it, would not probably be opened until they arrived in port, it would be more convenient to the passengers, to place them in the forward part of the barque, than to pile them up in front of the berths. If, therefore, the hogsheads did not block up the passage to this part of the vessel, and these chests and boxes were of this description, the space in question must be regarded as actually appropriated to the use of the passengers and their personal luggage.

Now, as the United States claim the forfeiture, it is incumbent on them to prove that the offence was committed; they must prove that the articles in question, were not such as could legally be placed in the portion of the barque allotted to the use of the passengers. But I see nothing in the testimony of the witnesses, adduced on the part of the prosecution, that can be regarded as proof of this fact. The custom-house officers saw chests and boxes there, filling up the space, and a coil of rope on one of the boxes; but they did not require them to be opened; they do not know what they contained, and they appear to have looked at them in a cursory and hasty manner, merely for the purpose of ascertaining whether any passengers were concealed among them. Some of these witnesses, indeed, suppose they contained cargo, because, as they say, they remained there after the passengers had left the ship; but from the slight examination given by them to these articles, it is perfectly impossible they could, with certainty, determine whether the chests and boxes seen there afterwards, were the same that they found there when they boarded the vessel. Indeed, so slight was the examination, that it is not very clear whether there were two or three casks blocking up the way, or whether there were or were not boxes at their sides.

It would be contrary to the first principles of justice, to convict an individual of an offence upon testimony like this. It was in the power of the officers of the government, to have these boxes and chests opened; to examine their contents, and to prove positively, directly and plainly, that they did not contain the personal luggage of the passengers, if such was the fact. And with such proof within their reach, and omitting to obtain and produce it, the seizure cannot be maintained, upon testimony so vague and inconclusive as that now offered; which does not speak from the actual knowledge of the witnesses, but consists of remote and doubtful inferences, which may or may not be correct. The coil of rope of which they speak, is proved to have been placed there after the vessel came into port.

In these remarks upon the testimony in support of the seizure, I have not intended to embrace the testimony of Doctor Palmoyer, who was one of the passengers in the barque. In relation to him, it is evident, from his own testimony, that he is a man of very excitable temperament, was engaged in very violent quarrels with the master and mate of the vessel, during the passage, and gives his testimony under the influence of strong feelings of resentment. Besides, he was a passenger on the upper or spardeck, and his knowledge of the situation of things between decks was obtained, for the most part, in occasional visits to patients to whom he was called. With his attention necessarily drawn to the sick, and without any particular motive for an attentive examination of the luggage or cargo, his recollections, at the time he gave his testimony, could not be very accurate or distinct, and would unavoidably be discolored, in his own mind, by the strong feelings under

which he was acting; without intending to impeach his integrity, or to impute to him a wilful departure from the truth, yet, it would be unsafe and unjust to act upon it; for he is in conflict with the evidence given by all the other passengers who were examined, and who had betters means of knowledge, as they were passengers between decks. Therefore, I put his testimony aside; but I doubt whether, if uncontradicted by others, and above all suspicion, it ought to be deemed, in a court of justice, sufficient to support the seizure, when, as in this case, the officers of the customhouse had it in their power to obtain positive and indisputable proof, by actual inspection, and yet have omitted to do so.

It appears, indeed, by the respondent's own showing, that some part of the space forward of the foremast was illegally occupied. Undoubtedly, he might lawfully bring up the potatoes and the household furniture of the passengers, for the purpose of drying them, after they had become damaged or wet by the storm, and he might temporarily keep them there for that purpose, but it was his duty to remove them as soon as this object was accomplished; for the ship-owners were bound to see that the ship was seaworthy, and capable of transporting her cargo and provisions without encroaching on the space appropriate to the use of the passengers. The hogsheads with potatoes, and the chests or boxes, with bed and bedding, or bureaus, or other household furniture, were certainly not the personal luggage of the passengers. Nor would their consent or supposed convenience justify this encroachment. The act of congress regulating the mode of transportation, is intended not only for the protection or convenience of the passengers, but also to guard our own cities from disease, and from the burden of supporting a multitude of persons brought to our shores with their health broken on the voyage, by overcrowding them in the ship, or feeding them with unwholesome food. And when the law has regulated the manner of transportation, and prescribed the proportion which the number of passengers shall bear to the space appropriated to their use, neither their assent nor request, nor their supposed convenience will justify the master in violating the provisions of the act of congress.

If the articles, thus illegally placed on the deck, occupied the space which the law requires for five passengers, the vessel would, undoubtedly, be subject to forfeiture; for, as the whole deck was sufficient for only the one hundred and eighty-five passengers with which she sailed; and the space for fifteen had been cut off at the stern, if the space for five more was unlawfully occupied in the forward part of the vessel, it would make the passengers exceed, by twenty, the number which could be legally taken on board, in the space occupied by them and their personal luggage.

But the space occupied by these unlawful obstructions was not measured; even the number of hogsheads, and of boxes or chests containing household furniture, is not very clearly established, and the evidence of their dimensions are loose estimates, very little better than conjecture. When the burden of proof is on the prosecution, testimony of this character is entirely insufficient to convict the party. It is very true, that the master and owners, in this case, are not entitled to any favorable construction of their acts and motives; for it is proved beyond doubt, that almost immediately after leaving Bremer Haven, he put up the bulkhead at the mizen mast, with one hundred and eighty-five passengers on board, thus wilfully and deliberately violating the act of congress, by overcrowding the space remaining for the passengers he had taken, even if his vessel had been authorized to transport one hundred and ninety-two, according to the certificate he had obtained. This curtailment of the space was not sufficiently great to forfeit the vessel, but it is quite sufficient to make it the duty of the court to scrutinize carefully his defences, and to listen with caution to the excuses he may offer, when he is professing to act by the request of the passengers, or for their convenience. Yet, however indefensible his conduct may have been, there is no evidence to justify a decree of condemnation.

It has been suggested, that the passengers brought on the spar-deck, in what was called the second cabin and the steerage, were unlawfully placed there, and that under the true construction of the acts of congress, that deck ought to be free, for exercise and fresh air, for the passengers on the deck below; and if this be the construction of the law, there was clearly an excess of more than twenty beyond the number which could be lawfully transported. But, although the libel and answer, and testimony show the number of passengers in the cabin, second cabin and steerage, on the upper or spar-deck, still this circumstance is not made a charge against the master and ship-owners; nor is the forfeiture of the ship claimed on this ground; nor was that point made in the district court. The point suggested is therefore not properly before me on this record, and I abstain from expressing any opinion upon it. Testimony as to the purposes to which the spar-deck was usually applied, when the act of 1847 was passed, may perhaps be necessary to enable the court to decide this question.

For the reasons hereinbefore stated, the decree of the district court must be affirmed.